UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANNETTE BURNS, )<br>)<br>Individually and on Behalf of all )<br>Similarly Situated Persons, )<br>                                     )<br>        Plaintiff,   )<br>)<br>        v.        )<br>)<br>DISTRICT OF COLUMBIA, )<br>)<br>        Defendant.   ) | Civil Action No.  06-1198 (RBW)<br><br>CLASS ACTION |

**EXHIBIT 1 TO PLAINTIFF'S SURREPLY TO DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Not Reported in F.Supp.  Page 1
Not Reported in F.Supp., 1996 WL 509601 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

[Briefs and Other Related Documents](#)

American Forest & Paper Ass'n, Inc. v. U.S. E.P.A.D.D.C.,1996.Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
AMERICAN FOREST & PAPER ASS'N, INC., Plaintiff,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.
CIV.A. No. 93-cv-0694(RMU).

Sept. 4, 1996.

MEMORANDUM OPINION

[URBINA](#), District Judge.

Denying EPA's Motion to Strike; Granting EPA's Motion for Leave to File a Surreply; Granting AFPA's Motion for Voluntary Dismissal; Granting in Part and Denying in Part AFPA's Motion for Partial Summary Judgment; and Granting in Part and Denying in Part EPA's Motion for Summary Judgment

**\*1** This matter comes before the court upon defendant United States Environmental Protection Agency's ("EPA") motion to strike; EPA's motion for leave to file surreply; plaintiff American Forest and Paper Association, Inc.'s ("AFPA") motion for voluntary dismissal; AFPA's motion for partial summary judgment; and EPA's motion for summary judgment.

This action challenges an EPA informal rulemaking as arbitrary and capricious in violation of the Administrative Procedure Act, [5 U.S.C. §§ 551](#) *et seq.* In particular, AFPA alleges that EPA promulgated certain human health water quality criteria (1) based on inaccurate estimates of pollution exposure; (2) based on discredited scientific evidence; (3) without adequately explaining the derivation of the criteria promulgated; and (4) without responding to certain comments filed by AFPA during rulemaking.

The court concludes that EPA acted rationally in promulgating the water quality criteria at issue, except insofar as it did not adequately respond to two comments AFPA filed during rulemaking. The court remands the criteria in question to EPA for an adequate response to AFPA's comments. The court declines to vacate the criteria pending EPA's response on remand.

Upon consideration of the submissions of the parties and the entire record herein, the court, in the Order accompanying this Memorandum Opinion, denies EPA's motion to strike; grants EPA's motion for leave to file a surreply; grants AFPA's motion for voluntary dismissal; grants in part and denies in part AFPA's motion for partial summary judgment; and grants in part and denies in part EPA's motion for summary judgment.

I. Background

In this action, AFPA challenges EPA's promulgation of human health water quality criteria for two toxic pollutants: 2,3,7,8-tetrachlorodibenzo-p-dioxin ("dioxin") and pentachlorophenol ("PeCP").[FN1] AFPA argues that the informal rulemaking at issue in this case, which involved the promulgation of water quality criteria for 91 toxic pollutants, was procedurally and substantively flawed with respect to the dioxin and PeCP criteria in violation of the Administrative Procedure Act, [5 U.S.C. §§ 551](#) *et seq.* In particular, AFPA claims that (1) EPA overestimated pollution exposure in its criteria calculations; (2) EPA relied on outdated and discredited scientific data to calculate the dioxin criterion; (3) EPA failed to explain the derivation of the PeCP criterion; and (4) EPA failed to respond to various comments made by AFPA during rulemaking.

> [FN1.](#) Pursuant to the Water Quality Act of 1987, codified in the Clean Water Act at [33 U.S.C. § 1313(c)(4)](#), EPA is authorized to promulgate binding "water quality criteria" for toxic pollutants. The water quality criterion for a given toxic pollutant represents the maximum pollutant level (usually expressed as a numerical concentration) deemed necessary to protect the designated use (e.g., drinking, recreation, industrial) of a particular water body. Water quality criteria are utilized to, *inter alia,* ration pollution discharge permits for particular toxic pollutants.

The following material facts are undisputed by the parties. On November 19, 1991, EPA published a proposed rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 509601 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

Case 1:06-cv-01198-RBW    Document 17-2    Filed 11/14/2006    Page 3 of 16

Page 2

setting water quality criteria and implementation procedures for numerous toxic pollutants. *See* 56 Fed. Reg. 58,420. This rule, known as the National Toxics Rule ("NTR"), was proposed in order to bring various states into compliance with the Clean Water Act. The NTR is binding only on those states that have not fulfilled their statutory obligation under the Clean Water Act to issue their own water quality criteria for toxic pollutants. States may avoid NTR compliance by adopting alternative water quality criteria, subject to approval by EPA. It is EPA's policy to approve any state-adopted criteria that are scientifically defensible and sufficiently protective of designated water uses.[FN2]

> FN2. A state's water quality criteria need not be as stringent as the criteria promulgated in the NTR. In fact, EPA has approved a dioxin water quality criterion adopted by Virginia which is 100-times less stringent than the dioxin criterion promulgated in the final NTR. EPA justified the approval by asserting that Virginia's dioxin criterion was scientifically defensible because scientific opinion regarding dioxin's cancer potency is currently disputed by some research. *See* Appendix 16 to EPA's Memorandum.

**\*2** EPA used the following formula to derive the water quality criterion for each carcinogenic pollutant included in the NTR:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 509601 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

$$\text{Tolerable risk of adverse effect} \times \text{Body weight} = \text{CPF} \times [\text{WIR} + (\text{FCR} \times \text{BCF})]$$

where:

| | |
|---|---|
| tolerable risk of adverse effect = | acceptable risk that criterion-level exposure over 70-year lifetime will produce cancer in an individual. |
| CPF= | cancer potency factor of the toxic pollutant (a scientifically derived value for each pollutant representing relative toxicity). |
| WIR= | water intake rate (a figure representing an average individual's total water consump- |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 509601 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

| | |
|---|---|
| | tion). |
| FCR= | fish consumption rate (a figure representing an average individual's total fish consumption). |
| BCF= | bioconcentration factor (a scientifically derived value representing the degree to which a pollutant migrates to the flesh of fish). |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01198-RBW    Document 17-2    Filed 11/14/2006    Page 6 of 16

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 509601 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

Page 5

EPA accepted public comment on the proposed NTR for 30 days.[FN3] AFPA filed over 800 pages of comments in response to the proposed NTR, lodging four principal objections: first, that the 30-day comment period was unreasonably short; second, that EPA failed to explain its recalculation of the water quality criteria whose values as reflected in the NTR differ from previous EPA criteria recommendations;[FN4] third, that the pollution exposure rates (water intake and fish consumption) used by EPA to calculate the criteria in the proposed NTR are substantially overestimated; and fourth, that the scientific evidence relied upon by EPA to assess dioxin's cancer potency is outdated, resulting in a flawed dioxin criterion in the proposed NTR.

> FN3. EPA justifies the brevity of the comment period by referencing the statutory mandate to promulgate the final NTR within 90 days of the publication of the proposed NTR. See 33 U.S.C. § 1313(c)(4). However, EPA did not promulgate the final NTR until December 1992, 13 months after publication of the proposed NTR. EPA explains that this delay was necessary to allow EPA to respond to comments and reconsider certain criteria.

> FN4. Pursuant to the Clean Water Act, EPA had previously promulgated non-binding water quality criteria for many of the pollutants covered by the NTR. These "recommended water quality criteria" were used as a guide by states to develop their own water quality criteria pursuant to the Clean Water Act.

On December 22, 1992, EPA promulgated the final NTR. See 57 Fed. Reg. 60,848. No change was made to the dioxin or PeCP criteria as a result of any comments filed during the NTR comment period. EPA did, however, reconsider the proposed criteria for a number of other toxic pollutants. As a result, EPA omitted twelve proposed criteria from the final NTR.

II. Discussion

A. Preliminary Motions

1. EPA's Motion to Strike

EPA moves to strike the affidavit of Russell S. Frye, counsel to AFPA, submitted by AFPA in support of its motion for partial summary judgment. EPA argues that the court's review of EPA's action must be confined to the administrative record. AFPA maintains that it may supplement the administrative record to provide the court with background information and to support its claims that EPA committed procedural errors during rulemaking.

The Frye affidavit is divided into five sections. The first two sections describe AFPA and the nature of this action, including an explanation of EPA's procedures relating to the establishment of water quality criteria. The third section details AFPA's efforts to comment on the proposed NTR and references alleged deficiencies in the administrative record. The fourth section describes the impact of the final NTR on AFPA's members. The fifth section cites EPA statements outside the administrative record that suggest that EPA knowingly relied upon outdated data regarding dioxin's cancer potency factor.

*3 Judicial review of an agency action is normally confined to the administrative record.[FN5] When the procedural validity of an agency's action is disputed, however, "it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective." Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989). In addition, the court has discretion to supplement the administrative record to provide background information to facilitate judicial review. See AT&T Info. Sys. v. General Services Admin., 810 F.2d 1233, 1236 (D.C. Cir. 1987). Evidence challenging the merits and propriety of the agency's action, however, may not be considered by the reviewing court.[FN6]

> FN5. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985); Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam); Doraiswamy v. Secretary of Labor, 555 F.2d 832, 842-43 (D.C. Cir. 1976).

> FN6. See, e.g., Environmental Defense Fund v. Costle, 657 F.2d 275, 285-86 (D.C. Cir. 1981); Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir. 1980).

Several of AFPA's claims in this action challenge procedural aspects of the NTR rulemaking. For instance, AFPA alleges that EPA did not explain its recalculation of the PeCP criterion and that EPA failed to respond to certain AFPA comments regarding the PeCP and dioxin criteria. *Esch* makes clear that a court has discretion to supplement the administrative record on review where procedural questions are at issue. Because the Frye affidavit can be fairly characterized as providing background information and evidence relating to AFPA's procedural claims, the court denies EPA's motion to strike the Frye affidavit.

2. EPA's Motion for Leave to File a Surreply to AFPA's Motion for Partial Summary Judgment

In its proposed surreply, EPA seeks to bring to the court's attention several alleged inaccuracies in AFPA's reply memorandum. AFPA opposes EPA's motion for leave to file, which it characterizes as a "ploy for a unilateral rehashing of issues," on timeliness and efficiency grounds. AFPA argues that EPA has had previous opportunities, and will have a further opportunity at oral argument, to address some of the alleged inaccuracies it seeks to expose in its surreply.

AFPA also urges the court to adopt the five-day deadline for submission of reply memoranda to the filing of EPA's surreply. *See* Local Rule 108(d). As such, EPA's surreply would be untimely. EPA maintains that the federal appropriations freeze and accompanying closure of the federal government as well as the inclement weather of January 1996 made a more timely response impossible. EPA filed its motion for leave on February 13, 1996, one month after federal appropriations resumed and the government reopened after inclement weather.

The court may grant leave to file a surreply at its discretion.[FN7] EPA plausibly characterizes the arguments in its proposed surreply as responsive to issues initially raised in AFPA's reply memorandum. Moreover, EPA's proposed surreply is helpful to the adjudication of the summary judgment motions in this case, and is not unduly prejudicial to AFPA. Therefore, the court exercises its discretion to grant EPA's motion for leave to file its surreply to AFPA's motion for partial summary judgment.

FN7.   The Federal Rules of Civil Procedure and this district's Local Rules are silent on this issue. *But see* Arakelian v. National Western Life Ins. Co., 126 F.R.D. 1, 3 (D.D.C. 1989) (noting silence of the rules and the corresponding discretion of the court); *Chi v. Board of Educ. of Harford County*, 1996 WL 250023 (D. Md.) (noting court's discretion to accept surreply even when improperly filed); *Cramer Prods. v. International Comfort Prods.*, 1990 WL 58711 at *2 (D. Kan.), *aff'd*, 931 F.2d 900 (10th Cir. 1991) (noting court's discretion to accept surreply if court finds such helpful to its adjudication of the underlying issues).

3. AFPA's Motion for Voluntary Dismissal

**\*4** Pursuant to Fed. R. Civ. P. 41(a)(2), AFPA moves for voluntary dismissal without prejudice of the second count of its amended complaint. EPA does not oppose AFPA's motion. Accordingly, the court grants AFPA's motion; the second count of AFPA's amended complaint is dismissed without prejudice.

B. Cross-Motions for Summary Judgment

1. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is an appropriate mechanism for resolving cases involving review of an agency rulemaking on the administrative record. *See, e.g.,* Autek Sys. Corp. v. United States, 835 F. Supp. 13, 15 (D.D.C. 1993), *aff'd*, 43 F.3d 712 (D.C. Cir. 1994). As there are no material facts in dispute, the instant case shall be resolved on summary judgment.

2. Standard of Review

A district court reviewing an agency's action under the Administrative Procedure Act ("APA") is authorized to set aside any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency's action is neither arbitrary nor capricious so long as the agency "examine[s] the relevant data and articulate[s] a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

A plaintiff seeking review of an agency decision under the APA may raise only those objections on review that it raised during the rulemaking process with "sufficient specificity reasonably to alert the agency." *Tex Tin Corp. v. EPA,* 935 F.2d 1321, 1323 (D.C. Cir. 1991) (per curiam). Likewise, an agency may not offer post hoc rationalizations for the agency action under review, but is limited to the reasons for action evident in the administrative record. *See K N Energy, Inc. v. FERC,* 968 F.2d 1295, 1303 (D.C. Cir. 1990).

3. EPA's Pollution Exposure Estimates Relating to Dioxin and PeCP

In order to calculate a pollutant's human health water quality criterion, EPA must estimate public exposure to the pollutant. EPA does this in part by estimating the amount of fish and water people consume.[FN8] For purposes of the NTR, EPA estimated the total fish consumption of the average person to be 6.5 grams per day ("gm/day") -- less than 7 ounces per month -- and the total water intake of the average person to be 2.0 liters per day ("L/day").[FN9] In proposing its water quality criteria (which represent the upper limit of safe exposure), EPA assumed that the entire 6.5 gm/day of fish and 2.0 L/day of water consumed is contaminated at criteria levels.

> FN8.    *See* water quality criteria formula discussed *supra,* at p. 3.
>
> FN9.    *See* 56 Fed. Reg. 58,436. These figures represent average consumption over a 70-year lifetime.

AFPA lodges two principal objections relating to EPA's fish consumption and water intake estimates. First, AFPA argues that EPA overestimated both figures. During the rulemaking period, AFPA submitted scientific reports indicating that the average fish consumption is 1.5 gm/day and that the average water intake is 1.2 L/day. Second, AFPA argues that EPA erred in assuming that all 6.5 gm/day of fish and 2.0 L/day of water consumed are contaminated at criteria levels. AFPA points out that each consumption figure represents total fish or water consumption (contaminated and uncontaminated), and that EPA's assumption that all consumed fish and water is contaminated at criteria levels arbitrarily overstates pollution exposure.

a. Fish Consumption Estimate

**\*5** The two circuit courts that have addressed EPA's 6.5 gm/day fish consumption estimate have upheld it against allegations that the estimate is arbitrarily low.[FN10] The Fourth Circuit affirmed the District Court's conclusion that EPA "relied on scientifically defensible means to reach reasoned judgments regarding fish consumption levels." *NRDC v. EPA,* 16 F.3d 1395, 1403 (4th Cir. 1993). The Ninth Circuit approved of EPA's fish consumption estimate in the context of holding that EPA's adoption of an ambient dioxin concentration was neither arbitrary nor capricious. *See Dioxin/Organochlorine Ctr. v. Clarke,* 57 F.3d 1517, 1523-24 (9th Cir. 1995).

> FN10.    *See NRDC v. EPA,* 16 F.3d 1395, 1402-03 (4th Cir. 1993); *Dioxin/Organochlorine Ctr. v. Clarke,* 57 F.3d 1517, 1523-24 (9th Cir. 1995).

An agency action is neither arbitrary nor capricious if the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. Furthermore, "it is not for the judicial branch to undertake comparative evaluations of conflicting scientific evidence. [The court's] review aims only to discern whether the agency's evaluation was rational." *NRDC v. EPA,* 824 F.2d 1211, 1216 (D.C. Cir. 1987).

EPA clearly presented the scientific basis for its fish consumption figure of 6.5 gm/day and stated that the agency would modify relevant criteria if an ongoing review of the fish consumption figure so warranted. *See* 57 Fed. Reg. 60,888. AFPA's presentation of conflicting evidence does not automatically make EPA's action arbitrary because EPA has broad discretion in its selection of data and in its method of calculation. *See BP Exploration & Oil v. EPA,* 66 F.3d 784, 804 (6th Cir. 1995). The court joins the Fourth and Ninth Circuits in determining that EPA's action is sufficiently rational to be deemed neither arbitrary nor capricious.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

b. Water Intake Estimate

For purposes of the NTR, EPA estimated water intake to be 2.0 L/day.[FN11] AFPA contested this estimate during rulemaking, but EPA did not respond to AFPA's comment on this issue. On review, AFPA renews its objection to EPA's water intake estimate and argues that EPA's failure to respond to its comment during rulemaking renders EPA's promulgation of the dioxin and PeCP criteria arbitrary and capricious. The court concludes that the explanation for EPA's action proffered on review was not articulated during rulemaking and that a response to AFPA's comment was required. Therefore, the court remands the dioxin and PeCP criteria to EPA for an adequate articulation of the basis for EPA's water intake estimate in response to AFPA's comment on this issue.

> FN11. See 56 Fed. Reg. 58,436 (proposed rule); 57 Fed. Reg. 60,883, 60,888 (final rule).

The preambles to both the proposed and final NTR state that EPA's water intake estimate of 2.0 L/day is an "approximate national average."[FN12] During rulemaking, AFPA contested EPA's estimate of average water intake by submitting scientific studies suggesting that the average water intake is 1.2 L/day. On review, AFPA bolsters its challenge to EPA's 2.0 L/day estimate of average water intake by citing a 1990 document in which EPA itself states that the average water intake is 1.4 L/day.[FN13]

> FN12. See 56 Fed. Reg. 58,436 (proposed rule); 57 Fed. Reg. 60,883, 60,888 (final rule).
>
> FN13. AFPA references EPA's "Exposure Factors Handbook," March 1990 (Appendix 15 to EPA's Memorandum).

*6 EPA did not respond during rulemaking to AFPA's comment that EPA overestimated average water intake. On review, EPA defends the 2.0 L/day figure by asserting that it is a "reasonable worst-case estimate" of water intake.[FN14] Nowhere in the proposed NTR, however, did EPA refer to the 2.0 L/day figure as a "worst-case estimate." In fact, EPA repeatedly referred to the figure as a "national average." The only support for EPA's "worst-case estimate" explanation is a document included in the NTR administrative record, the final rule notice for a 1992 Safe Drinking Water Act rulemaking.[FN15] Part of this notice refers to the 2.0 L/day figure as a "reasonable worst-case estimate" of water intake and explains EPA's use of the 2.0 L/day figure in lieu of the 1.4 L/day figure as a justifiably conservative approach. On review, EPA argues that this document explains EPA's decision to use the 2.0 L/day figure in the NTR rulemaking.[FN16] This putative explanation, however, is inconsistent with the "national average" language contained in the preambles to both the proposed and final NTR. As such, the Safe Drinking Water Act notice, standing alone, is not a sufficient explanation of EPA's use of the 2.0 L/day figure in the NTR rulemaking.[FN17]

> FN14. EPA points out that its 1990 "Exposure Factors Handbook," referenced by AFPA, states that 2.0 L/day is a reasonable worst-case estimate of water intake.
>
> FN15. See 57 Fed. Reg. 31,787-88 (NTR administrative record at AR NL-37).
>
> FN16. EPA also argues that its placement of the Safe Drinking Water Act notice in the NTR administrative record relieves EPA of the duty to respond to AFPA's comment regarding EPA's use of the 2.0 L/day figure as a national average of water intake. EPA claims support for this argument in NRDC v. EPA, 859 F.2d 156 (D.C. Cir. 1988). In NRDC, the court held that EPA did not have to respond to comments regarding matters that were clearly discussed in the preamble to a proposed rule because EPA in effect "responded in advance" to the comments. NRDC, 859 F.2d at 188-89.
> Given EPA's reference to the 2.0 L/day figure as a "national average" in the preambles to the proposed and final NTR, the Safe Drinking Water Act notice in the NTR administrative record cannot be described as "respond [ [ing] in advance" to AFPA's comment. The inclusion of the notice in the NTR administrative record, therefore, does not obviate EPA's response to AFPA's comment.
>
> FN17. The court notes that there is no evidence, save EPA counsel's representation on review, that the Safe Drinking Water Act final rule notice was included in the NTR administrative record to explain the basis for EPA's water intake

estimate.

The court notes, however, that the "reasonable worst-case estimate" explanation contained in the Safe Drinking Water Act notice may be the bona fide explanation for EPA's use of the 2.0 L/day figure in the NTR rulemaking. EPA's "worst case estimate" explanation clearly existed during the NTR rulemaking, and therefore is not merely a post hoc rationalization by EPA's counsel on review. This putative explanation was simply not articulated as required in the proposed NTR or in response to AFPA's comment. This procedural defect warrants remand of the dioxin and PeCP criteria to EPA for an adequate explanation of its water intake estimate in response to AFPA's comment that the 2.0 L/day figure overestimates national average water intake.[FN18]

> FN18. *See, e.g., Home Box Office v. FCC,* 567 F.2d 9, 35-36 (D.C. Cir.), *cert. denied,* 434 U.S. 829 (1977) (emphasizing requirement that agency respond to significant comments); *Action on Smoking & Health v. Civil Aeronautics Bd.,* 699 F.2d 1209 (D.C. Cir. 1983) (remanding in part due to agency's failure to respond to significant comments).

The court may remand an agency rule without vacating it to allow an agency to correct a procedural defect in the rulemaking process. *See Fertilizer Inst. v. EPA,* 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("[W]hen equity demands, an unlawfully promulgated regulation can be left in place while the agency provides the proper procedural remedy.... [O]ur intervention into the process of environmental regulation ... should be accomplished with as little intrusiveness as feasible.").[FN19] The considerations relevant to the vacatur decision are "the seriousness of the [rule's] deficiencies ... and the disruptive consequences of an interim change [of the rule]." *International Union, UMW v. FMSHA,* 920 F.2d 960, 967 (D.C. Cir. 1990). In the context of remanding an agency decision, the D.C. Circuit has recently stated: "We are willing to assume for now that the agency's error was one of form and not of substance, i.e., that it will be able to provide the information necessary to explain its ... decisions. Therefore we reject petitioner's request that we vacate ... without awaiting the result of the agency's efforts on remand." *Engine Mfrs. Ass'n v. EPA,* 20 F.3d 1177, 1184 (D.C. Cir. 1994).

> FN19. The court's ability to remand a rule without vacating it has been questioned in this circuit. The disagreement stems from concurring and dissenting opinions in *Checkosky v. SEC,* 23 F.3d 452 (D.C. Cir. 1994) (per curiam), which raised but did not decide the issue. The weight of post-*Checkosky* authority in this circuit, however, supports the court's ability to remand without vacating. *See, e.g., United Dist. Cos. v. FERC,* --- F.3d ---, 1996 WL 392930 (D.C. Cir. July 16, 1996) (citing *Checkosky* for ability to remand without vacating); *A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484, 1492 (D.C. Cir. 1995) (same); *American Medical Ass'n v. Reno,* 57 F.3d 1129, 1135 (D.C. Cir. 1995) (remanding without vacating, but reserving judgment on validity of this practice); *American Water Works Ass'n v. EPA,* 40 F.3d 1266, 1273 (D.C. Cir. 1994) (same).

*7 Because EPA may have a rational and bona fide explanation for its use of the 2.0 L/day figure, and because vacating the criteria would likely disrupt EPA's enforcement of the Clean Water Act, the court declines to vacate the dioxin and PeCP criteria. The court remands the criteria to EPA for an adequate response to AFPA's comments regarding EPA's water intake estimate of 2.0 L/day. The court allows EPA until December 13, 1996 to respond. If EPA fails to respond, the criteria will be vacated automatically on December 13, 1996.[FN20]

> FN20. *Cf. A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484, 1492 (D.C. Cir. 1995) (providing for automatic vacatur). Furthermore, AFPA will have 60 days from the publication of EPA's response to re-open this case. Upon expiration of the 60 days, this action will stand dismissed with prejudice.

c. EPA's Assumption That All Fish and Water Consumed is Contaminated at Criteria Levels

During rulemaking, AFPA challenged EPA's assumption (for criteria calculation purposes) that all fish and water consumed is contaminated at criteria levels. EPA responded that "the assumption that an individual may drink from the same [[[contaminated] surface water for their [sic] lifetime is reasonable and meets the goal of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[Clean Water Act]." 57 Fed. Reg. 60,888. Regarding fish consumption, EPA's response merely states that "EPA's methodology assumes that the 6.5 grams per day of aquatic life were taken from waters meeting the criteria level," citing an appendix to a 1980 EPA guideline document. *Id.* A review of the cited document indicates that it is not responsive to AFPA's comment.[FN21]

> [FN21.] The cited document is "Appendix C - Guidelines and Methodology Used in the Preparation of Health Effect Assessment Chapters of the Consent Decree Water Criteria Documents," 45 Fed. Reg. 79,347-49.

EPA's assumption that all water consumed is contaminated at criteria levels is rational. EPA has clearly articulated its consideration of AFPA's objection to this assumption, and has determined that a conservative approach best secures the aims of the Clean Water Act. As the Ninth Circuit recently noted, EPA does not act arbitrarily when it "consistently [takes] a conservative approach with a reasonably wide margin for safety." *Dioxin/ Organochlorine Ctr.,* 57 F.3d at 1525.

On review, EPA argues that the same conservative rationale offered to support EPA's water intake assumption underlies EPA's exposure assumption regarding fish consumption. While EPA articulated this explanation regarding water intake in response to AFPA's comment, EPA did not articulate it regarding fish consumption. EPA's "response" to AFPA's comment on this point is a mere restatement of EPA's assumption. *See* 57 Fed. Reg. 60,888. This procedural defect warrants remand of the dioxin and PeCP criteria.[FN22]

> [FN22.] *See, e.g., Home Box Office v. FCC,* 567 F.2d 9, 35-36 (D.C. Cir.), *cert. denied,* 434 U.S. 829 (1977) (emphasizing requirement that agency respond to significant comments); *Action on Smoking & Health v. Civil Aeronautics Bd.,* 699 F.2d 1209 (D.C. Cir. 1983) (remanding in part due to agency's failure to respond to significant comments).

Because EPA may be capable of adequately explaining its exposure assumption regarding fish consumption, and because vacating the criteria would likely disrupt EPA's enforcement of the Clean Water Act, the court declines to vacate the dioxin and PeCP criteria. The court remands the criteria to EPA for an adequate response to AFPA's comment regarding EPA's assumption that all consumed fish are contaminated at criteria levels. *Cf. Engine Mfrs. Ass'n,* 20 F.3d at 1184 (remanding in similar circumstances). The court allows EPA until December 13, 1996 to provide such a response. If EPA fails to respond, the criteria will be vacated automatically on December 13, 1996.[FN23]

> [FN23.] *Cf. A.L. Pharma, Inc.,* 62 F.3d at 1492 (providing for automatic vacatur). Furthermore, AFPA will have 60 days from the publication of EPA's response to re-open this case. Upon expiration of the 60 days, this action will stand dismissed with prejudice.

4. Dioxin Criterion

**\*8** AFPA raises two objections to EPA's promulgation of the dioxin criterion in the NTR. AFPA argues that (1) EPA arbitrarily promulgated a dioxin criterion, which relied on an outdated and discredited cancer potency factor, while it was in the midst of reassessing dioxin's health risk; and (2) EPA failed to respond to AFPA's comments regarding EPA's use of an outdated and discredited cancer potency factor for dioxin.

a. Cancer Potency Factor and EPA's Dioxin Reassessment

AFPA maintains that EPA arbitrarily relied on a study of dioxin's cancer potency that EPA knew to be outdated and discredited. For purposes of the NTR, EPA based its determination of dioxin's cancer potency on a 1984 EPA dioxin assessment, which in turn relied in part on a 1980 study of dioxin's cancer potency.[FN24] In 1990, an independent scientific review suggested that the 1980 study significantly overstated dioxin's cancer potency.[FN25] AFPA presented this updated scientific data during rulemaking. On review, AFPA notes that EPA was aware of the updated dioxin cancer potency data as early as February 1991, ten months prior to the promulgation of the proposed NTR.[FN26] In light of this, AFPA argues that EPA's use of the dioxin cancer potency estimate from its earlier 1984 study is arbitrary and capricious.

> [FN24.] The relevant documents are: "Ambient Water Quality Criteria for 2,3,7,8-Tetrachlorodibenzo-p-dioxin, February

> 1984" (Appendix 20 to EPA's Memorandum; administrative record at NL-4-65); and a 1980 tumor count by Dr. Robert Squire, analyzing pathology tissue slides from a 1978 rat dioxin feeding study by Kociba, et al. (administrative record at NL-4-65).
>
> FN25. The 1990 review was led by Dr. Robert Squire, the same scientist who had conducted the 1980 study of dioxin's cancer potency.
>
> FN26. AFPA notes that EPA referenced the updated cancer potency data in the context of its approval of Virginia's dioxin criterion on February 25, 1991.

EPA evidently anticipated objections during rulemaking to its promulgation of the dioxin criterion in the NTR. In September 1991, two months before the proposed NTR was published, EPA began a general reassessment of dioxin's health risks in light of newly emerging scientific data. EPA referenced this reassessment in the preamble to the proposed NTR, stating that "[EPA] will be carefully monitoring [the reassessment] in order to ensure that appropriate actions are taken during the course of this rulemaking to reflect any necessary changes resulting from the reassessment. If a final [EPA] action on this rulemaking occurs prior to the completion of [the reassessment], [EPA] will consider revisiting that decision." 56 Fed. Reg. 58,436.

On review, EPA argues that the dioxin criterion (including dioxin's cancer potency factor) is subject to reasonable scientific debate.FN27 EPA maintains that it still views dioxin as an extremely serious health threat, and notes that even if the updated cancer potency estimate cited by AFPA is accurate, the overall dioxin criterion might remain the same due to possible changes in other criterion factors. These concerns are reflected in EPA's response to AFPA's comment during rulemaking: "It is too early in the process of scientific reassessment to support major changes in either the substance or timing of regulatory decisions related to dioxin." 57 Fed. Reg. 60,884. Accordingly, EPA argues that the dioxin criterion promulgated in the final NTR is reasonable pending possible modification by EPA's dioxin reassessment, which is still ongoing.

> FN27. EPA notes that its recognition of this fact is evident from its approval of Virginia's dioxin criterion, which is 100-times less stringent than the dioxin criterion promulgated in the final NTR. Virginia had relied on an FDA estimate of dioxin's cancer potency that was significantly lower than EPA's estimate.

"[I]t is not for the judicial branch to undertake comparative evaluations of conflicting scientific evidence. [The court's] review aims only to discern whether the agency's evaluation was rational." *NRDC v. EPA,* 824 F.2d 1211, 1216 (D.C. Cir. 1987). Furthermore, "[i]f an agency in the course of an informal rulemaking does not attempt either to close itself off from informed opinion or to extend its reach beyond the scope of permissible authority, then it is [the court's] duty to accept that judgment if it is rational and not unreasonable. The fact that an agency's decision ... rests on a set of evidentiary facts less desirable or complete than one which would exist in some regulatory utopia does not alter [the court's] role." *National Ass'n of Reg. Util. Comm'rs v. FCC,* 737 F.2d 1095, 1140 (D.C. Cir. 1984), *cert. denied,* 469 U.S. 1227 (1985).

**\*9** It is clear that EPA recognized the diversity of scientific opinion concerning dioxin's health risks. As *NRDC* and *FCC* make clear, it is not the court's role to decide between conflicting scientific evidence, especially where an agency appears to have considered all the available evidence. In light of EPA's express acknowledgment of the state of scientific knowledge on this issue, the court concludes that EPA's promulgation of a dioxin criterion in the NTR was neither arbitrary nor capricious.FN28

> FN28. AFPA insinuates that EPA's decision to withdraw several other criteria during rulemaking shows that EPA acted arbitrarily by promulgating the dioxin criterion in the final NTR in the face of conflicting scientific evidence as to dioxin's cancer potency. To the contrary, this persuades the court that EPA was responsive to comments during rulemaking but found withdrawal inappropriate in the case of dioxin.

b. EPA's Failure to Respond to AFPA's Comment

EPA did not directly respond to AFPA's comment regarding EPA's reliance on its 1984 estimate of dioxin's cancer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

potency factor. EPA did, however, respond to AFPA's objection to the promulgation of a dioxin criterion while EPA's dioxin reassessment was ongoing. *See* 57 Fed. Reg. 60,884.

"The fundamental purpose of the response requirement is, of course, to show that the agency has indeed considered all significant points articulated by the public ...." *NRDC v. EPA,* 859 F.2d 156, 188 (D.C. Cir. 1988). In circumstances where a response to a comment would amount to a restatement of what had already been set forth in the preamble to the proposed rule, "there [[[is] no error in failing to respond to legal objections that were thereafter raised during the comment period." *Id.* at 188-89.

EPA clearly stated in the preamble to the proposed NTR that it would carefully monitor its dioxin reassessment and consider changes to the NTR should such become necessary. *See* 56 Fed. Reg. 58,436. The court is persuaded that EPA's adequate response to AFPA's comment regarding the 1984 estimate of dioxin's cancer potency factor would have amounted to a restatement of EPA's position as articulated in the preamble to the proposed NTR. As such, a response was unnecessary. Therefore, EPA's failure to respond does not render its rulemaking invalid under the APA.

### 5. PeCP Criterion

AFPA challenges EPA's promulgation of the PeCP criterion in the NTR on three grounds. Each challenge is procedural in nature and based on a deviation between the PeCP criterion promulgated in the NTR and EPA's previously recommended PeCP criterion.[FN29] First, AFPA contends that EPA failed to explain the basis for the recalculated PeCP criterion, and that this failure deprived AFPA of its right to meaningfully comment on the NTR rulemaking. Second, AFPA maintains that EPA's decision to recalculate the PeCP criterion is an agency "change in policy" that EPA unlawfully failed to explain. Third, AFPA argues that EPA failed to respond to AFPA's comments regarding these alleged rulemaking deficiencies.

> FN29.   Pursuant to the Clean Water Act, EPA had previously promulgated a non-binding water quality criterion for PeCP. This "recommended water quality criterion" was one among many that EPA developed to facilitate states' development of their own water quality criteria pursuant to the Clean Water Act.

a. AFPA's Ability to Raise its PeCP Objections on Review

Preliminarily, EPA argues that AFPA is precluded from challenging the PeCP criterion on review because AFPA did not raise this specific objection during rulemaking. During rulemaking, AFPA objected to a general lack of information regarding the scientific basis for approximately three-fourths of the criteria promulgated in the NTR, although it did not specifically reference the PeCP criterion.[FN30] AFPA collectively challenged those criteria, of which PeCP was one, that EPA recalculated using its Integrated Risk Information System ("IRIS").[FN31] AFPA's comment gave examples of criteria recalculated using IRIS, but did not mention PeCP.

> FN30.   AFPA's comment during rulemaking was as follows:
> EPA's Federal Register notice of the proposed national water quality [ [ [criteria] provides only a slight explanation of the basis for the pollutant concentrations that will dictate wastewater treatment requirements for thousands of dischargers. The table setting forth those standards ... gives only cryptic indications of the basis for these criteria. For those commenters able to review the administrative record at EPA library, there is still precious little explanation for the derivation of EPA's proposed standards. *No indication is contained in the administrative record of how EPA derived revised human health criteria for 84 of the 105 pollutants covered by the standards, other than a reference to the Integrated Risk Information System (IRIS) computerized database maintained by EPA ....* [N]one of the underlying studies (some of which are unpublished), which form the very basis for the proposed standards, were [ [ [sic] available either in the administrative record or in the IRIS computer database.
> *See* AFPA Comments at 7-8 (emphasis added) (Appendix I to AFPA's Memorandum).

> FN31.   IRIS is a publicly available electronic database that contains the official EPA consensus on the cancer and non-cancer risks of pol-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lutants.

**\*10** EPA relies on *Tex Tin Corp. v. EPA,* 935 F.2d 1321 (D.C. Cir. 1991) (per curiam), for the proposition that, on review, a party may raise only those objections that it raised during rulemaking with "sufficient specificity reasonably to alert the agency." *Tex Tin Corp.,* 935 F.2d at 1323. In *Tex Tin Corp.,* the Court of Appeals held that the plaintiff was barred from objecting to certain wind direction data on review because the plaintiff "failed to object to the wind direction data on the date in question when it made its comments to the agency, although it raised this very objection regarding wind direction data on other test dates, which EPA then chose not to rely upon." *Id.* EPA argues that *Tex Tin Corp.* controls the instant case because AFPA failed to reference specifically the PeCP criterion in its comment during rulemaking.

*Tex Tin Corp.,* however, is distinguishable from the instant case. The *Tex Tin Corp.* court noted that the plaintiff's comments during rulemaking in that case likely had the effect of excluding non-mentioned dates from EPA's attention. *Id.* at 1323. In the instant case, AFPA made specific references to several criteria as examples of the inadequacies to which it was objecting. There is no reason to believe that AFPA's citation of certain examples of a designated class of criteria would distract EPA's attention such that EPA would not be on notice that the PeCP criterion was also being challenged. Therefore, AFPA is not barred from raising its objection on review merely because it chooses to press this objection specifically in reference to the PeCP criterion.

AFPA's second objection on review, that EPA's recalculation of the PeCP criterion constituted a "change in policy," was not raised during rulemaking. This objection will therefore not be considered by the court. *See Tex Tin Corp.,* 935 F.2d at 1323.

b. EPA's Alleged Failure to Explain the Basis for the Recalculated PeCP Criterion

The PeCP criterion promulgated in the NTR is approximately 4,000 times more stringent than EPA's previously recommended PeCP criterion. The preamble to the proposed NTR states that the water quality criteria for some pollutants covered by the NTR had been recalculated, and explains in some detail the method used to arrive at the recalculated criteria.[FN32] The criteria table in the proposed NTR notes that the PeCP criterion was recalculated using an updated cancer potency factor located in PeCP's entry in IRIS. *See* 56 Fed. Reg. 58,443. The proposed NTR also notes that the bioconcentration factor from a 1980 PeCP criterion document was used to recalculate the PeCP criterion promulgated in the NTR. *Id.*

> FN32. *See* 56 Fed. Reg. 58,435. The preamble explains that affected criteria for carcinogens, including PeCP, were recalculated using updated cancer potency factors which are located in the particular pollutant's entry in IRIS.

i. The IRIS Cancer Potency Factor

The IRIS entry for PeCP includes an updated cancer potency factor for PeCP, which, if used in the water quality criteria formula, yields the recalculated PeCP criterion promulgated in the NTR. In addition, the IRIS entry for PeCP abstracts the study EPA relied on to update the cancer potency factor, and explains that "the [updated cancer potency] factor is calculated as the geometric mean of the [cancer potency] factors for each [PeCP] preparation" in the referenced study. *See* IRIS printout at 6-7 (Appendix 19 to EPA's Memorandum).

**\*11** AFPA argues that this explanation of the recalculated PeCP criterion is insufficient to allow AFPA to comment meaningfully on the NTR rulemaking. Specifically, AFPA contends that it is not sufficient for EPA to provide a "retracing" of the derivation of the recalculated PeCP criterion. AFPA argues, moreover, that the IRIS entry for PeCP is difficult to interpret.

An agency must "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *Florida Power & Light Co. v. United States,* 846 F.2d 765, 771 (D.C. Cir. 1988), *cert. denied,* 490 U.S. 1045 (1989). To meet this requirement, an agency must "provide an accurate picture of the reasoning that has led the agency to the proposed rule ...." *Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 530 (D.C. Cir.), *cert. denied,* 459 U.S. 835 (1982).

Applying these standards, the court concludes that EPA's explanation of its recalculated PeCP criterion was sufficient to allow AFPA to comment meaningfully. The proposed NTR clearly explains the derivation of the recalcu-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lated PeCP criterion. Furthermore, the IRIS entry for PeCP, which is specifically referenced in the proposed NTR, abstracts the study relied upon by EPA to update the cancer potency factor and recalculate the PeCP criterion. [FN33] AFPA maintains that EPA must include in the administrative record a separate document specifically showing its recalculation of the PeCP criterion, but cites no case that supports this contention. [FN34] The court declines to create such a requirement.

> [FN33.] AFPA apparently overlooked or misinterpreted the explanation of the criteria recalculations offered in the proposed NTR. Although the proposed NTR instructs commenters to review IRIS for an updated cancer potency factor for PeCP, AFPA complains that the IRIS entry did not contain the recalculated PeCP criterion. There is no suggestion in the proposed NTR that the recalculated criterion would be located in IRIS, however.

> [FN34.] AFPA claims that the instant case is directly analogous to Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (D.C. Cir. 1978), in which the Court of Appeals held that EPA's reliance on "calculations, also not reflected in the record, based on information scattered throughout the record" deprived the plaintiff in that case of its right to comment meaningfully on the rulemaking. See Weyerhaeuser Co., 590 F.2d at 1031. The facts of Weyerhaeuser Co. are significantly different from those in the instant case, however. In Weyerhaeuser Co., the EPA made calculations that affected the plaintiff's effluent limitation after the notice and comment period was over, using data purposefully excluded from the administrative record to arrive at calculations that were admittedly inaccurate. See id. at 1029. In the instant case, EPA clearly explained the derivation of the recalculated PeCP criterion and included the scientific support for its recalculation in the administrative record.

ii. The 1980 PeCP Criterion Document

The proposed NTR noted that the bioconcentration factor from a 1980 PeCP criterion document was used to recalculate the PeCP criterion for purposes of the NTR. On review, AFPA argues that EPA failed to include this document in the NTR administrative record, and that this failure renders EPA's promulgation of the PeCP criterion arbitrary and capricious. [FN35]

> [FN35.] AFPA maintains that the inclusion of the 1980 PeCP criterion document in the administrative record is a disputed material fact. It appears, however, that this is primarily a question of law, turning on the legal definition of "administrative record." EPA maintains that all documents referenced in the proposed NTR are, as a matter of law, included in the administrative record. AFPA argues that the administrative record is the actual physical docket EPA maintains at its library in Washington, D.C. The court does not reach this issue because AFPA failed to raise this objection during rulemaking.

AFPA's argument rests on the affidavit of a paralegal employed by AFPA's counsel. A 1995 search by the paralegal revealed that the 1980 PeCP criterion document was not located in the NTR rulemaking docket located at EPA's library in Washington, D.C. See Bishop Affidavit at ¶ 3. Furthermore, the paralegal was told by an EPA employee that the document was not part of the administrative record. Id. at ¶ 4.

EPA correctly notes that AFPA did not raise this objection during rulemaking. Indeed, it appears that AFPA had not researched this issue until 1995, four years after the NTR comment period ended. Furthermore, EPA's general comments as to the lack of information regarding the recalculation of various criteria were insufficient to put EPA on notice that a copy of the 1980 PeCP criterion document may have been missing from the NTR docket during rulemaking. [FN36] Because AFPA failed to raise this objection during rulemaking, at which time EPA would have been able to remedy any omissions in the docket, it is precluded from doing so on review. Tex Tin Corp., 935 F.2d at 1323.

> [FN36.] EPA further notes that a 1995 search says little about whether or not a copy of the document was in the docket during the NTR comment period in 1991. The court agrees.

c. EPA's Failure to Respond to AFPA's Comment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***12** AFPA lastly argues that EPA failed to respond to its comment that EPA inadequately explained the scientific basis for the recalculated criteria in the NTR. EPA, however, did in fact provide an adequate response. In the final NTR, EPA replied to concerns over the use of IRIS by reiterating how EPA utilizes IRIS, how commenters may access IRIS, and the peer review that EPA uses prior to updating criterion factors through IRIS. *See* 57 Fed. Reg. 60,875.

### III. Conclusion

For the foregoing reasons, the court, in the Order accompanying this Memorandum Opinion, denies EPA's motion to strike; grants EPA's motion for leave to file a surreply; grants AFPA's motion for voluntary dismissal; grants in part and denies in part AFPA's motion for partial summary judgment; and grants in part and denies in part EPA's motion for summary judgment.

### *ORDER*

Denying EPA's Motion to Strike; Granting EPA's Motion for Leave to File a Surreply; Granting AFPA's Motion for Voluntary Dismissal; Granting in Part and Denying in Part AFPA's Motion for Partial Summary Judgment; and Granting in Part and Denying in Part EPA's Motion for Summary Judgment

For the reasons set forth in the accompanying Memorandum Opinion, it is, on this 4 day of September 1996,

ORDERED that EPA's motion to strike be and hereby is denied; and it is

FURTHER ORDERED that EPA's motion for leave to file a surreply be and hereby is granted; and it is

ORDERED that the second count of AFPA's amended complaint be and hereby is dismissed without prejudice; and it is

FURTHER ORDERED that AFPA's motion for partial summary judgment be and hereby is granted in part and denied in part; and it is

ORDERED that EPA's motion for summary judgment be and hereby is granted in part and denied in part; and it is

FURTHER ORDERED that the human health water quality criteria for 2,3,7,8-tetrachlorodibenzo-p-dioxin and pentachlorophenol, as promulgated by the EPA at 57 Fed. Reg. 60,911-12, 40 C.F.R. § 131.36, be and hereby are remanded to EPA for an adequate response to (1) AFPA's comment during rulemaking that the water intake estimate of 2.0 L/day overstates the national average water consumption; and (2) AFPA's comment during rulemaking that EPA's assumption that all consumed fish are contaminated at criteria levels overstates pollution exposure. If, by December 13, 1996, EPA has failed to respond pursuant to this Order, the relevant human health criteria will be vacated automatically; and it is

ORDERED that if, within 60 days after EPA's publication of supplemental responses pursuant to this Order, none of the parties move to re-open the case, this action will stand dismissed with prejudice.

SO ORDERED.

D.D.C.,1996.
American Forest & Paper Ass'n, Inc. v. U.S. E.P.A.
Not Reported in F.Supp., 1996 WL 509601 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:93cv00694 (Docket) (Apr. 05, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.